## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF INDIANA
## HAMMOND DIVISION

| | | |
|---|---|---|
| NATHIAN E. BAILEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 2:11-CV-124 |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social | ) | |
| Security, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

This matter is before the Court for review of the Commissioner of Social Security's decision denying Disability Insurance Benefits to Plaintiff, Nathian E. Bailey. For the reasons set forth below, the Commissioner of Social Security's final decision is **AFFIRMED.**

BACKGROUND

On March 6, 2007, Plaintiff, Nathian E. Bailey ("Bailey"), applied for Social Security Disability Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. section 401 et seq. Bailey initially alleged his disability began on February 4, 2005, the date he suffered a workplace injury to his right knee. The Social Security Administration denied his initial application and also denied his claims on reconsideration. On October 8, 2009, Bailey appeared with a non-attorney representative and testified at an administrative

hearing before Administrative Law Judge ("ALJ") Stephen E. Davis ("Davis"). On November 13, 2009, ALJ Davis denied Bailey's DIB claim, finding that Bailey had not been under a "disability" as defined in the Social Security Act.

Bailey requested that the Appeals Council review the ALJ's decision. This request was denied. Accordingly, the ALJ's decision became the Commissioner's final decision. *See* 20 C.F.R. § 422.210(a)(2005). Bailey has initiated the instant action for judicial review of the Commissioner's final decision pursuant to 42 U.S.C. section 405(g).

DISCUSSION

Facts

Bailey was born on July 30, 1969, and was 35 years old on the alleged disability onset date. (Tr. 17, 28). Bailey's alleged impairments include right knee pain, hypertension, diabetes mellitus, obesity, degenerative disc disease of the lumbar spine, a torn rotator cuff, arthritis of the hands, and anxiety. His only past relevant work is carpentry.

At the administrative hearing, Plaintiff testified that he became disabled when he injured his right knee in an on-the-job accident in February 2005. (Tr. 29). Plaintiff reported that his doctors had informed him that there was no way that he could return to his former job as a carpenter following his right knee injury. (Tr. 29).

Plaintiff testified that he had a bad limp secondary to his knee injury, which required him to use a cane to walk. (Tr. 30). Plaintiff testified that he was able to lift and/or carry up to 10 pounds. (Tr. 34).

The medical evidence can be summarized as follows:

In February 2005, Plaintiff presented to the emergency room with complaints of right knee pain after he slipped on ice and felt a pop in his right knee. (Tr. 187, 282). Plaintiff reported that he had minimal swelling and that he was able to walk straight without difficulty, but that his right knee felt unstable when he tried to twist it. (Tr. 187). It was subsequently determined that Plaintiff had sustained a right anterior cruciate ligament ("ACL") tear and a right medial collateral ligament ("MCL") tear. (Tr. 209, 281). Dr. Scott Andrews, an orthopedic surgeon, recommended that Plaintiff undergo right ACL reconstruction surgery. (Tr. 209).

In March 2005, Plaintiff underwent right ACL reconstruction surgery on his right knee, which he tolerated well with no complications. (Tr. 220-21). Within a few days of the surgery, Dr. Andrews reported that Plaintiff was doing well overall with some residual pain that was not too bad and good range of motion in his knee. (Tr. 276, 279). By the end of March 2005, Dr. Andrews reported that Plaintiff's pain symptoms had decreased quite a bit. (Tr. 276). Dr. Andrews recommended that Plaintiff begin physical therapy on his right knee. (Tr. 276, 279). Dr. Andrews indicated that Plaintiff was

unable to work at that time, but would hopefully be able to return to work within approximately six weeks. (Tr. 276).

In April 2005, Dr. Andrews reported that Plaintiff was doing well overall following his ACL reconstruction surgery on his right knee. (Tr. 274). Upon physical examination, Dr. Andrews noted that Plaintiff's knee looked good and felt solid. (Tr. 274). Dr. Andrews recommended that Plaintiff continue physical therapy for another few weeks before returning to work. (Tr. 274).

In May 2005, Dr. Andrews reported that Plaintiff was doing better with range of motion and various activities. (Tr. 269). Plaintiff reported that he had experienced a sensation of his right knee giving way, and Dr. Andrews noted that Plaintiff had just a slight bit of laxity in his right knee. (Tr. 269). Dr. Andrews stated that Plaintiff would benefit from further physical therapy for range of motion and strengthening of his right knee. (Tr. 269).

In June 2005, Dr. Andrews reported that Plaintiff's range of motion was very good with only a little bit of laxity in his right knee. (Tr. 267). Plaintiff reported that his pain symptoms had improved with only a little bit of residual pain around his kneecap area and laterally. (Tr. 267).

In July 2005, Plaintiff complained of continuing instability in his right knee following his right ACL reconstruction surgery. (Tr. 190). Plaintiff reported that he did well at first following the surgery, but that he eventually started developing laxity in the right

-4-

knee. (Tr. 190). Dr. Andrews reported that Plaintiff's right knee had good range of motion upon physical examination. (Tr. 190). Dr. Andrews diagnosed Plaintiff with right knee ACL insufficiency and recommended that he undergo revision arthroscopy of his right knee with possible revision right ACL reconstruction. (Tr. 190).

In late July 2005, Plaintiff underwent a right knee arthroscopy performed by Dr. Andrews, which revealed that Plaintiff's ACL was intact and in good condition with no real problems at all. (Tr. 199, 260). Dr. Andrews noted that Plaintiff's ACL did not appear to be particularly lax at all. (Tr. 199, 260). Because Plaintiff's graft was in good condition and was under reasonable tension, Dr. Andrews felt as if Plaintiff would not benefit from an ACL revision. (Tr. 199).

In September 2005, Dr. Andrews released Plaintiff to return to work with restrictions that included no climbing ladders, squatting, or kneeling. (Tr. 249). Later that month, Plaintiff reported that he had been using a brace and that he was doing okay overall. (Tr. 246). Dr. Andrews noted that Plaintiff might not be able to perform his past work as a roofer, given that it involved activities such as climbing ladders, squatting, and kneeling. (Tr. 246).

In October 2005, Plaintiff underwent a medical evaluation performed by Dr. Jonathan Javors, an orthopedic surgeon. (Tr. 524-26). X-rays of Plaintiff's knees revealed some disuse osteopenia of the right knee with no other abnormalities. (Tr. 525). Dr. Javors noted that Plaintiff had full range of motion in his right knee and

that his ACL graft was very well-maintained with no instability. (Tr. 525-26). Based on his examination, Dr. Javors diagnosed Plaintiff with delayed healing status post-ACL reconstruction. (Tr. 526). Dr. Javors opined that Plaintiff could not return to full duty as a carpenter at that time because he would be at too much risk for his knee to give out and cause further damage to his knee and other areas. (Tr. 526). However, Dr. Javors opined that Plaintiff would be able to work a sedentary, sit-down job with some standing and walking that did not involve walking on uneven surfaces, climbing ladders, or working at heights. (Tr. 526). Dr. Javors recommended that Plaintiff participate in a home exercise program and consider trying to find a different line of work. (Tr. 526).

In November 2005, Plaintiff complained of some residual pain and limping in his right knee. (Tr. 247). Dr. Andrews noted that Plaintiff's overall range of motion was good and that Plaintiff had some laxity, but that it was not too bad. (Tr. 247). Dr. Andrews opined that Plaintiff was able to return to work with restrictions that included no climbing and no squatting. (Tr. 247). Dr. Andrews stated that it appeared as if Plaintiff's past work as a roofer was probably not the best job for him, as he would be better able to perform some type of land-based construction. (Tr. 247).

In November 2005, Plaintiff also presented to Dr. James Hill, an orthopaedic surgeon, with complaints of ongoing pain and swelling in his right knee. (Tr. 417). Plaintiff also reported that he had

problems squatting, kneeling, and climbing. (Tr. 417). Upon physical examination, Dr. Hill reported that Plaintiff had a normal gait with full range of motion in his right knee and no discernable ligamentous laxity. (Tr. 417). Dr. Hill reported that Plaintiff had a negative McMurray's sign with no knee swelling. (Tr. 417). Dr. Hill noted that Plaintiff had a large screw in his proximal tibia, which might be contributing some of Plaintiff's pain symptoms. (Tr. 417). Dr. Hill indicated that Plaintiff might be a candidate for internal fixation removal. (Tr. 417). Dr. Hill directed Bailey to have an MRI and return following the MRI. (Tr. 417).

In January 2006, an MRI of Plaintiff's right knee revealed that his ACL graft was normal. (Tr. 419). In February 2006, Plaintiff complained of ongoing pain in the patellofemoral area of his right knee. (Tr. 239). X-rays of Plaintiff's right knee revealed that his hardware was in very good position with no problems there at all. (Tr. 239). Dr. Andrews opined that the tibial screw does extend four to five millimeters posteriorly but he believed this was normal, and not the cause of Bailey's pain. Dr. Andrews noted that it was interesting that Plaintiff's pain symptoms seemed to be around the patellofemoral area, which had looked fine during the arthroscopic surgery and was not the area that should have been affected by the ACL reconstruction surgery. (Tr. 239). Dr. Andrews recommended that Plaintiff continue with work restrictions of no kneeling, crawling, squatting, or climbing. (Tr. 239).

In February 2006, Dr. Hill noted that Plaintiff had marked tenderness on palpation of his proximal tibia in the region of his hardware screw, but had full range of motion of his knee with no discernible ligamentous laxity. (Tr. 419). Dr. Hill recommended that Plaintiff undergo surgery to remove the screw in his right knee. (Tr. 419). Dr. Andrews did not agree with Dr. Hill's recommendation, stating that "I would only recommend taking out this screw if he was recommending a revision ACL surgery." (Tr. 239).

Later that month, Dr. Hill performed surgery to remove the screw from Plaintiff's right knee. (Tr. 393-94). Dr. Hill noted that the surgery revealed that Plaintiff had a 50% tear of his ACL graft, a Grade 1 chondromalacia of his patella, and marked scarring of his medial gutter which was genestrated and rubbing on his medial femoral condyle, but there was no discernable ligamentous laxity. (Tr. 420).

In March 2006, Dr. Hill reported that Plaintiff was doing well with some residual pain in his right knee, but full range of motion and only mild knee effusion. (Tr. 422).

In April 2006, Dr. Andrews opined that Plaintiff could continue with work restrictions of no lifting over 10 pounds, no climbing, no squatting, and no kneeling. (Tr. 231, 235).

In August 2006, Plaintiff presented to Dr. Hill with complaints of ongoing pain in his right knee. (Tr. 423). Plaintiff stated that he did not believe that he could return to his former job as a carpenter. (Tr. 423). Upon examination, Dr. Hill noted that

Plaintiff had a normal gait, full range of motion in his knee, and no discernable ligamentous laxity. (Tr. 423). Dr. Hill recommended that Plaintiff undergo a functional capacity evaluation and stated that he felt that Bailey had "a permanent disability." (Tr. 423).

In September 2006, Plaintiff underwent a residual functional capacity evaluation, which revealed that Plaintiff was capable of performing a sedentary job that did not involve any squatting or kneeling. (Tr. 424). In November 2006, Dr. Hill noted that Plaintiff had a normal gait with full range of motion in his knee and no discernable ligamentous laxity. (Tr. 424). Dr. Hill encouraged Plaintiff to continue performing home exercises. (Tr. 424).

In February 2007, Plaintiff presented to Dr. Hill with complaints of ongoing pain in his right knee that was aggravated by activity and weather changes. (Tr. 425). Upon examination, Dr. Hill noted that Plaintiff had an antalgic gait and required a cane to ambulate. (Tr. 425). Dr. Hill encouraged Plaintiff to continue performing home exercises. (Tr. 425).

In May 2007, Dr. B. Sheikh conducted a consultative medical examination on Plaintiff. (Tr. 308-12). Plaintiff reported that he had sustained a right knee injury in February 2005 with ACL repair and reconstruction, but claimed that his right knee was getting worse. (Tr. 308). Plaintiff also reported that he suffered from left knee and back pain. (Tr. 308). Dr. Sheikh noted that Plaintiff was a cooperative, well-developed, obese male who was in no painful distress

during the examination.  (Tr. 309). Dr. Sheikh noted that Plaintiff
was stable at station and appeared comfortable in the seated and
supine positions.  (Tr. 309).  He noted that Plaintiff had a limping
gait due to knee pain and walked with a cane.  (Tr. 309, 311).  Upon
physical examination, Dr. Sheikh reported that Plaintiff's spine was
normal with no signs of deformities, tenderness, or limitation in
range of motion and that Plaintiff had full strength and full range
of motion in both upper extremities.  (Tr. 310).  With regard to
Plaintiff's lower extremities, Dr. Sheikh reported that Plaintiff had
pain in both knees with decreased range of motion, but had normal
range of motion in all other lower extremities; normal muscle strength
in all major muscle groups; and normal sensation and reflexes.  (Tr.
310, 313).  Dr. Sheikh noted that Plaintiff was unable to walk heel
to toe and tandemly and was unable to stoop and squat, but was able
to get on and off the examination table with some difficulty.  (Tr.
311).  Dr. Sheikh opined that the clinical evidence supported
Plaintiff's need for an ambulatory aid.  (Tr. 311).  Based on his
examination, Dr. Sheikh diagnosed Plaintiff with "Diabetes Mellitus
Type II; Hypertension, not controlled with medications; Bilateral Knee
Pain, Rule Out Degenerative Joint Disease with restricted range of
motion; and Obesity."  (Tr. 311).

In May 2007, Dr. J. Sands, a state agency reviewing physician,
opined that Plaintiff was able to lift and/or carry less than 10
pounds frequently and 10 pounds occasionally; stand and/or walk for

-10-

at least 2 hours in an 8-hour workday with the use of a medically required hand-held assistive device; and sit for about 6 hours in an 8-hour workday. (Tr. 315). Dr. Sands opined that Plaintiff could never climb ladders, ropes, or scaffolds, but could occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl. (Tr. 316). Dr. Sands further opined that, because he ambulated with a cane, Plaintiff should avoid concentrated exposure to slick or uneven surfaces and unprotected heights. (Tr. 318). Dr. D. Neal, another state agency reviewing physician, affirmed Dr. Sands' opinion in August 2007. (Tr. 327).

In August 2007, Plaintiff presented to Dr. Hill with ongoing complaints of pain in his right knee, which was essentially unchanged from his prior visits. (Tr. 427). Dr. Hill noted that Plaintiff had an antalgic gait and still used a cane to ambulate. (Tr. 427). Plaintiff had crepitus on flexion and extension of his knee with anterior knee pain, but no discernable ligamentous laxity. (Tr. 427). Dr. Hill opined that Plaintiff's condition was permanent and stationary. (Tr. 427).

In August 2007, Dr. William Shipley, a state agency reviewing psychologist, opined that Plaintiff did not have a severe mental impairment. (Tr. 328).

In November 2007, Plaintiff returned to Dr. Hill with ongoing complaints of pain in his right knee that was essentially unchanged from his prior visits. (Tr. 428). Dr. Hill indicated that he

believed that Plaintiff had posttraumatic arthritis of his right knee. (Tr. 428). In April 2008, Dr. Hill opined that, although Plaintiff was unable to perform his past job as a carpenter due to his right knee injury, he remained capable of working at a sedentary job. (Tr. 505).

In December 2008, Dr. Jeffrey Coe conducted a consultative medical examination on Plaintiff. (Tr. 703–11). Plaintiff presented with complaints of relatively constant pain in his right knee, made worse by exertion; a limping gait favoring his right knee; difficulty climbing or descending stairs; and difficulty kneeling or squatting. (Tr. 708). Plaintiff reported that he needed a cane to ambulate. (Tr. 708). Dr. Coe's physical examination revealed a gait abnormality marked by right knee stiffness and limited right knee weight bearing; marked tenderness around the right knee joints; associated decreased range of motion in the right knee in flexion and extension; and associated residual right knee swelling. (Tr. 710). Dr. Coe reported that Plaintiff had no medial or lateral instability of the knees. (Tr. 709). Dr. Coe also noted that Plaintiff had normal muscle strength and normal sensation in his lower extremities. (Tr. 709). Dr. Coe opined that Plaintiff would require work limitations that included limitations in kneeling, squatting, and climbing throughout the workday. (Tr. 710). Dr. Coe also believed that Bailey required the ability to change positions as needed throughout his workday. (Tr. 710).

-12-

In May 2009, Dr. Paul Russo completed a Functional Capacity Examination form for Bailey. (Tr. 541-45). Dr. Russo opined that Bailey was able to lift and/or carry 20-10 pounds rarely and less than 10 pounds occasionally, stand and/or walk for less than 2 hours in an 8-hour working day, and sit for less than 2 hours in an 8-hour working day. (Tr. 543-44).

On February 24, 2010, more than three months following the ALJ's decision, Bailey's underwent MRIs of his lumbar spine and cervical spine. The reports from the MRIs state that Bailey suffers mild to moderate disc herniation and mild changes of cervical spondylosis and scoliosis. (Tr. at 736-737; 740-42).


Review of Commissioner's Decision

This Court has authority to review the Commissioner's decision to deny social security benefits. 42 U.S.C. § 405(g). "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ." *Id.* Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a decision." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). In determining whether substantial evidence exists, the Court shall examine the record in its entirety, but shall not substitute its own opinion for the ALJ's by reconsidering the facts or re-weighing evidence. *Jens v. Barnhart*, 347, F.3d 209, 212 (7th Cir. 2003). With that in mind, however, this

-13-

Court reviews the ALJ's findings of law de novo and if the ALJ makes an error of law, the Court may reverse without regard to the volume of evidence in support of the factual findings. *White v. Apfel*, 167 F.3d 369, 373 (7th Cir. 1999).

As a threshold matter, for a claimant to be eligible for DIB under the Social Security Act, the claimant must establish that he is disabled.  To qualify as being disabled, the claimant must be unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. §§ 423(d)(1)(A) and 1382(a)(1).  To determine whether a claimant has satisfied this statutory definition, the ALJ performs a five step evaluation:

Step 1:   Is the claimant performing substantial gainful activity: If yes, the claim is disallowed; if no, the inquiry proceeds to Step 2.

Step 2:   Is the claimant's impairment or combination of impairments "severe" and expected to last at least twelve months?  If not, the claim is disallowed; if yes, the inquiry proceeds to Step 3.

Step 3:   Does the claimant have an impairment or combination of impairments that meets or equals the severity of an impairment in the SSA's Listing of Impairments, as described in 20 C.F.R. § 404, Subpt. P, App. 1? If yes, then claimant is automatically disabled; if not, then the inquiry proceeds to Step 4.

Step 4:   Is the claimant able to perform his past relevant work? If yes, the claim is denied; if no, the inquiry proceeds to Step 5, where the burden of proof shifts to the Commissioner.

Step 5:   Is the claimant able to perform any other work within his
          residual functional capacity in the national economy: If
          yes, the claim is denied; if no, the claimant is disabled.

20 C.F.R. §§ 404.1520(a)(4)(i)-(v) and 416.920(a)(4)(i)-(v); *see also*

*Herron v. Shalala*, 19 F.3d 329, 333 n. 8 (7th Cir. 1994).

In this case the ALJ found that Bailey was not engaged in
substantial gainful activity and that he suffered from a severe
impairments; namely, post-traumatic arthritis of the right knee.  The
ALJ further found that Bailey did not meet or medically equal one of
the listed impairments and could not perform any of his past relevant
work, but nonetheless retained the physical residual functional
capacity to perform a reduced range of sedentary work.   More
specifically, the ALJ found that:

> The claimant can occasionally lift and carry ten
> pounds, and frequently lift and carry less than
> ten pounds.  He can stand and/or walk at least
> two hours of an eight hour work day with the use
> of a single cane.  He can sit about six hours of
> an eight hour work day.  He is unable to push
> and/or pull objects using the right lower
> extremity.  He can occasionally climb stairs and
> ramps but never ladders, ropes, or scaffolds.  He
> can occasionally balance, stoop, kneel, crouch,
> and crawl.   The claimant should avoid
> concentrated exposure to uneven surfaces and
> unprotected heights.

(Tr. 15).

With these limits in mind, the ALJ found that Bailey could not
perform his past relevant work, but that there were jobs existing in
significant numbers in the national economy that Bailey could perform.
(Tr. 17-18).   Thus, Bailey's claim failed at step five of the

-15-

evaluation process.  Bailey believes that reversal is required because the ALJ's decision was not supported by substantial evidence.

Bailey believes that the ALJ failed to build an accurate and logical bridge between the evidence and his decision, as is required. *See Craft v. Astrue*, 539 F.3d 668 (7th Cir. 2008)("The ALJ is not required to mention every piece of evidence but mut provide an 'accurate and logical bridge' between the evidence and the conclusion that the claimant is not disabled, so that 'as a reviewing court, we may assess the validity of the agency's ultimate finding and afford [the] claimant meaningful judicial review.").  Bailey's attorney has submitted a brief which raises a considerable number of arguments. Most arguments consist of no more than a paragraph and contain few citations to either the record or relevant case law.  This Court would be within its authority to deem many of claimant's arguments waived. *Vaughn v. King*, 167 F.3d 347, 354 (7th Cir. 1999)("It is not the responsibility of this court to make arguments for the parties."). Nonetheless, because the Social Security process is designed to be non-adversarial, this Court chooses not to exercise that authority and will consider each of the claimant's arguments, whether adequately developed or not.  *See Nelson v. Apfel*, 131 F.3d 1228, 1236 (7th Cir. 1997).


ALJ Davis' Step 2 Finding

Bailey argues that ALJ Davis erred in finding that Bailey's only

-16-

severe impairment was post-traumatic arthritis of the right knee.
(DE 14 at 3).  Bailey believes that the ALJ "failed to account for
several other contributing and debilitating impairments, including but
not limited to his back..... [and] neck."  The ALJ did not fail to
consider Bailey's other impairments.  His opinion reveals that he did
indeed consider them.  He explicitly found that there was "no evidence
that obesity, alone or in combination with another medically
determinable physical or mental impairment, significantly limits his
physical or mental ability to do basic work activities..." (Tr 14).
The ALJ found that Bailey's diabetes mellitus and hypertention
appeared to be generally controlled.  (*Id.*)  And, with regards to the
back and neck, as well as the rotator cuff injury, arthritis of the
hands, and anxiety, the ALJ found that "the record contains no
objective evidence of the claimant's diagnoses or treatment of these
alleged conditions."  (*Id.*).

Following the ALJ's decision, when seeking review by the Appeals
Council, Bailey's representative submitted reports from MRIs of the
cervical and lumbar spine that show that Bailey indeed suffers mild
to moderate disc herniation and mild changes of cervical spondylosis
and scoliosis. (Tr at 736-737; 740-42).  It is this evidence that
Bailey relies upon to support his argument that the ALJ erred at Step
2.  This Court cannot, however, find that the ALJ erred based on
evidence that he did not have and could not have considered at the

time he issued his opinion.[1] *See Eads v. Sec'y of Health and Human Servs.*, 983 F.2d 815, 816-17 (7th Cir. 1993)(An ALJ "cannot be faulted for having failed to weight evidence never presented to him."); *Rice v. Barnhart*, 384 F.3d 363, 366 n. 2 (7th Cir. 2004)("Although technically a part of the administrative record, the additional evidence submitted to the Appeals Council ... cannot now be used as a basis for a finding of reversible error.").

Furthermore, the Seventh Circuit has stated that "[d]eciding whether impairments are severe at Step 2 is a threshold issue only; an ALJ must continue on to the remaining steps of the evaluation process as long as there exists even *one* severe impairment." *Arnett v. Astrue*, 676 F.3d 586, 591 (7th Cir. 2012).  As long as the ALJ

---

[1]Whether the Appeals Council erred in refusing review based on Bailey's submission of new evidence is a different question; one not raised by Bailey.  Bailey, in his reply brief, does claim that it would be "manifestly unjust" to disregard the evidence because it wasn't available at the time of the Commissioner's decision.  (DE 23 at 2).  Even if this Court were inclined to construe this argument as requesting remand based on new, material evidence, Bailey's counsel has not provided this Court with sufficient information to make a determination of whether a remand of this sort is appropriate.  42 U.S.C. § 405(g)(sentence six); *See also Fry v. Astrue*, No. 07-C-0927, 2010 WL 2036200 (E.D. Wis. 2010)("[S]uch a remand may be ordered 'only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding.'").  He fails to explain why the tests could have been obtained sooner, and he does not provide any rational for believing it would materially affect the outcome.  The additional records contains only MRI reports, and they provide little aid in assessing the severity of Bailey's impairment.  (Tr. 741-42, reports indicate mild disc degeneration, calcification, mild changes of cervical spondylosis, and mild scoliosis).

finds at least one impairment is severe, any error with regards to other impairments is harmless. *Id.; see also Castile v. Astrue*, 617 F.3d 923, 927-28 (7th Cir. 2010).

<u>Dr. Hill's finding that Bailey was Permanently Disabled</u>

Bailey also argues that the ALJ erred in failing to mention in his decision that Dr. James Hill found that he suffered from a permanent disability. (DE 14 at 3). Dr. Hill was deposed in April of 2008, and at that time, he opined that Bailey suffered a "permanent disability." (Tr. 505). Dr. Hill was asked the following question during his deposition testimony: "[a]nd so when you talk about his permanent disability, it's not that he can't work, but that he must work at a sedentary job?" (Tr. 505). Dr. Hill responded in the affirmative. (*Id.*). ALJ Davis did not discuss this particular opinion of Dr. Hill.    Claimant's attorney seems to equate Dr. Hill's statement that Bailey has a "permanent disability" with being eligible for benefits under the SSD program.  The statement, however, must be read in context, and the context makes it clear that Dr. Hill is not of the opinion that Bailey is unable to work in any substantial gainful capacity.  Hill's statement was made in the context of a discussion regarding Bailey's right knee injury.  It is undisputed that he has a severe impairment of his right knee, and the ALJ's decision is not inconsistent with Hill's opinion.  Furthermore, the determination of whether Bailey is disabled as defined under the Social Security Act is not one for Dr. Hill to make; it is a

determination reserved to the commissioner.   While the ALJ *must* consider medical evidence of Bailey's impairments, the final responsibility for deciding Bailey's RFC is reserved to the Commissioner, and a treating physician's opinion that the claimant is "disabled" or "unable to work" will not be given any special significance.  *See Bjornson v. Astrue*, 671 F.3d 640, 647-48 (7th Cir. 2012).

<u>ALJ Davis' Step 3 Finding that Bailey's Impairments do not Meet or Equal a Listing</u>

Next, Bailey argues that ALJ Davis erred at step three by failing to find that Bailey had no impairment or combination of impairments that met or medically equaled any of the impairments included in the Listing of Impairments ("Listing") at 20 C.F.R. pt. 404, subpt. P, App. 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

At step three, an ALJ must determine whether a claimant's impairment or combination of impairments meets or equals the criteria of a particular listing.  The Listing describes impairments for each of the major body systems that the SSA has determined are severe enough to prevent any gainful activity regardless of age, education, or work experience.  20 C.F.R. § 404.1525.  The claimant bears the burden of demonstrating his condition meets or equals all of the criteria of the listed impairment. *See Ribaudo v. Barnhart*, 458 F.3d 580, 583 (7th Cir. 2006) (citing *Maggard v. Apfel*, 167 F.3d 376, 379 (7th Cir. 1999)).  The Seventh Circuit has held that "failure to

discuss or even cite a listing, combined with an otherwise perfunctory analysis, may require a remand." *Brindisi ex rel. Brindisi v. Barnhart*, 315 F.3d 783, 786 (7th Cir. 2003 (citation omitted).  Such an analysis essentially frustrates any attempt at judicial review and prevents a court from applying the "decision structure undergirding disability determinations to a substantive analysis of [a claimant's] impairments." *Id.* (*citing Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002)).  When an ALJ fails to discuss evidence in light of a listing's analytical framework, the court is left "with grave reservations as to whether [the ALJ's] factual assessment addressed adequately the criteria of the listing." *Scott,* 297 F.3d at 595. However, in a decision subsequent to both *Brindisi* and *Scott*, the Seventh Circuit clarified that failure to explicitly refer to the relevant listing alone does not necessitate reversal and remand. *Rice v. Barnhart*, 384 F.3d 363, 369 –370 (7th Cir. 2004).  In *Rice*, the court pointed out that, even though the ALJ did not refer to a particular listing in his decision, both the claimant's attorney and the VE referenced the sole applicable listing at the hearing.  *Id.* at 369.  Therefore, satisfied that the ALJ must have considered the listing, the court concluded that sufficient evidence existed in the record to show the claimant did not meet all of the criteria needed for that particular listing.  *Id*.

The ALJ's analysis at Step 3 is cursory; he states only the following to support his determination that Bailey does not have an

impairment or combination of impairments that meets or equals the Listings:

> The effects of the claimant's right knee impairment have not caused the degree of ambulatory limitation required under this [sic] listing 1.02(A) Major Dysfunction of a Joint or 1.00B2b. Despite his use of a single cane, the claimant has intact lower extremity function. Clinical examination revealed no medial or lateral instability of the bilateral knees (Exhibit 28F at 7).

(Tr. 14).

Here, Bailey argues that he meets the requirements of Listing 1.02A, Major Dysfunction of a Joint. 20 C.F.R. Part 404, Subpart P, App. 1. To meet or equal this listing, Bailey must show that he has major dysfunction of a joint due to any cause "characterized by gross anatomical deformity (e.g. subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s)" with "[i]nvolvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b." 20 C.F.R. Part 404, Subpart P, App. 1, § 1.02A. Ineffective ambulation is described as an extreme limitation of the ability to walk. It is generally defined as "having insufficient lower extremity functioning to permit independent

ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities." 20 C.F.R. Part 404, Subpart P, App. 1, § 1.00B2b(1).  Examples provided by the regulations include "the inability to walk without the use of a walker, two crutches or two canes..." 20 C.F.R. Part 404, Subpart P, App. 1, § 1.00B2b(2).

Bailey argues that the evidence submitted from Dr. Coe provides "ample evidence of a major dysfunction" of a joint.  (DE 14 at 4). But this ignores the evidence that Bailey uses a cane in one hand. Where a claimant uses a cane in only one hand to ambulate, he does not meet or equal Listing 1.02A.  *See Coleman v. Astrue*, 269 Fed. Appx. 596, 603 (7th Cir. 2008).  Accordingly, Bailey has not sustained his burden of demonstrating his impairments satisfied all the requirements of the listing.

Bailey argues that the ALJ inappropriately disregarded Dr. Coe's medical opinion due to the ALJ's misunderstanding of the meaning of "microinstability".  Namely, Bailey contends that the ALJ used the prefix "micro" to speculate that a microinstability is not particularly significant.  There are at least two problems with this argument.  First, Dr. Coe testified that a microinstability, unlike a gross laxity, is only a "slight weakness in [the ACL] - which allows *small* amounts of shifting with steps, with twisting, with turning, and it's that *small* additional wobble in the knee from the partial tear of the ligament that causes increased stress and strain within the

-23-

knee joint and is a factor in the breakdown of the cartilage within the knee joint that is posttraumatic arthritis." (Tr. 468-69). Thus, the prefix "micro" appears to be used in keeping with the ordinary understanding of the term. Secondly, even if Bailey were correct that Dr. Coe's opinion was inappropriately disregarded, it does not alter the fact that he ambulates with only one cane; in other words, he still does not meet or equal the listing.

Bailey also argues that it "changes the equation" when you consider the microinstability *together with* his obesity. It does not. It is clear from the opinion that the ALJ *did* consider Bailey's obesity; he just did not find it to be as limiting as Bailey's counsel believes it is. And, as for considering the back and/or neck pain related to the obesity, the ALJ considered this too, but believed there was no evidence to support Bailey's claims, which was accurate at the point in time that the decision was made. The ALJ found that, despite the use of a cane, Bailey's lower extremity function was in tact, and did not cause the degree of ambulatory limitations required under the listing. (Tr. 14). Accordingly, the ALJ found that neither the purported back and neck impairments (which there was no medical evidence of at the time) nor *his* obesity were so limiting to his ambulation that the listing could be met. The ALJ found that Bailey does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments. The record as a whole suggests that the ALJ was aware of Bailey's multiple impairments

-24-

and properly considered them in combination.  *See Corey v. Barnhart*,
No. 02-0320-C-T/F, 2002 WL 663130 at *4 (S.D. Ind. Mar. 14,
2002)("Though use of words such as 'combination of impairments' or
'combined effect of impairments' may not be mandatory, use of these
or similar words would clearly reflect that the ALJ considered [the
claimant's] impairments in combination.").

<u>ALJ Davis' Step Five Finding</u>

Bailey believes the ALJ erred in finding that, despite not being
able to perform his past relevant work, he remains capable of
performing other work that exists in significant numbers in the
national economy.  After determining that Bailey could not perform his
past relevant work, ALJ Davis relied upon the Medical-Vocational
Guidelines, commonly referred to as the "Grids", to determine whether
Bailey was capable of engaging in any other substantial gainful
activity.  *See* 20 C.F.R. Part 404, Subpart P, App. 2 § 200.00; SSR 83-
14, 1983 WL 31254 (1983).  The "Grids" are utilized by ALJ's to
determine whether a claimant is disabled taking into account the
claimant's age, education, previous work experience, and maximum level
of work.  Bailey was classified as a younger individual age 18-44.
He has a high school education.  His previous work experience as a
carpenter was not transferable, and his RFC was sedentary work.  In
the absence of non-exertional limitations, the Grids direct that such
an individual is "not disabled."  Where there are non-exertional

limitations, the grids do not direct a finding of "not disabled" but are used as a framework.  SSR 83-14, 1983 WL 31254 (1983).  The ALJ determined that Bailey had the following additional non-exertional limitations:  the use of a single cane, an inability to push and/or pull objects using the right lower extremity, and only occasional climbing of stairs and ramps, never climbing ladders ropes or scaffold, and only occasionally balance, stoop, kneel, crouch, and crawl.  And avoiding concentrated exposure to uneven surfaces and unprotected heights. The ALJ determined that even though Bailey had these additional functional limitations, they had little or no effect on the occupational base of unskilled sedentary work.  (Tr. 17-18).

Rather than pointing to any error in the ALJ's application of the grids[2], Bailey asserts that "[t]he unbiased evidence leads to the conclusion that the Plaintiff could no longer perform his work as a carpenter *and that he was not mentally equipped to do non-labor related jobs in any adequate manner*." (DE 14 at 5, emphasis added). Bailey points out that he has only a high school diploma, and that he lacks "technological skills." (DE 14 at 5).  Bailey complains that "his intellectual aptitude or ability was not addressed at all in the determination, yet remains a primary impediment to any ability to work in a white collar office setting, which in this case is that practical

---

[2]Bailey does not argue that these non-exertional limitations substantially reduced the range of work available and that the ALJ therefore had an obligation to consult a VE on this issue. *See Luna v. Shalala*, 22 F.3d 687, 691 (7th Cir. 1994).

definition of sedentary." (DE 14 at 7). The problem with this argument is that nothing in the record suggests that Bailey's intellectual aptitude would be an impediment to a significant number of sedentary jobs. Neither Bailey nor his representative made an effort to inform the ALJ of any cognitive, mental or emotional deficits that would further limit Bailey's ability to work. It does not appear that Bailey has any learning disability or was in any remedial classes in school. There is no suggestion that he has a low Intelligent Quotient. While limitations in "aptitude" may be an issue for Bailey, those issues were not raised before the ALJ, and he can not be faulted with failing to consider impairments for which there was no evidence. According to Bailey:

> Arriving at the conclusion that the Plaintiff could perform sedentary work unnecessarily and unfairly heightens the requirement for receiving Social Security benefits. It is always possible to think of some plausible occupation for an individual seeking benefits, however this thinking ignores the reality of one's ability to adapt and sets the standard too high for those persons truly needing financial assistance due to a disability.

(DE14 at 5-6). This sort of policy argument for what the breadth and scope of the SSD program should be is more appropriately addressed to Congress. As the law currently stands, SSD benefits are available to a very limited class of individuals; namely, those who are unable "to engage in *any* substantial gainful activity ... for a continuos period of not less than twelve months." 42 U.S.C. §§ 423(d)(1)(A) and 1382(a)(1). It does not insure against poverty and it does not insure

against an inability to perform one's trade or profession.

Furthermore, Bailey seems to believe that a limitation to sedentary work is equivalent with a limitation to "white collar work." He offers nothing to support that claim, and it appears to be unwarranted.

Substantial evidence supports the ALJ's decision. This includes the opinions of Dr. Sands, Dr. Neil, Dr. Javors, Dr. Hill, Dr. Andrews, Dr. Coe, and Dr. Russo. In fact, although Bailey contends that the ALJ's opinion is not supported by substantial evidence, he does not point to a single medical opinion of record that supports his claim that he is completely unable to work as a result of his impairments.

<u>CONCLUSION</u>

For the reasons set forth above, the Commissioner of Social Security's final decision is **AFFIRMED**.

DATED: **September 7, 2012**                **/s/RUDY LOZANO, Judge**
                                            **United States District Court**